Good morning, Your Honors. Douglas Ingram on behalf of the petitioner. Basically, the issues in this case are did the Board of Immigration Appeals in affirming the immigration judge's decision in this matter have an articulable basis in which to deny the petitioner's application for political asylum after the mayor hearing? Now, the record will show that in the judge's I.J.'s oral decision, eight times in four pages she referred to the fact that she would have failed to, according to the I.J., properly respond to questions put to him as to his understanding as to the nature of the Christian religion. She basically pointed to three questions in which she found that his responses were implausible, such as, what is the Christmas holiday? His response was such that he incorporated the Easter holiday a bit into the Christmas holiday, basically stating that without the events of the Easter holiday, there would have been no Christmas holiday. Secondly, the gentleman stated that it was his understanding that Thanksgiving was a Christian holiday. He came to that conclusion because his pastor stated that it was a religious holiday where family members got together and had dinner and celebrated God. And, in fact, he is actually correct in that assertion. If you look at the proclamation of Abraham Lincoln in 1863, it was basically set forth that American people with one voice and one heart would go before and give thanks for what he has done for them. Thirdly, a question was put to the petitioner, what is the difference between the Old and the New Testament? The petitioner responded that the Old Testament was written in Hebrew and the New Testament was written in Greek. That's actually a true statement. The second follow-up was, is that the only difference that you know? Yes. I would assert that Chinese Pentecostals don't spend much time looking at the Old Testament. They're basically more versed in the New Testament. The petitioner stated in the record he's been a Christian for approximately four years prior to the marriage hearing. I reviewed the I.J.'s decision. I counted approximately ten inconsistencies in the petitioner's statements based on the questioning by the I.J. Isn't the I.J. entitled to make credibility determinations? And he also specifically noted that it wasn't just the answers, it was the demeanor of the petitioner. Isn't that appropriate and isn't that judge in the best position to judge that? Well, Your Honor, she made a reference to demeanor in one instance and that was to the question as to where he lived and did he go to church in Minnesota. That was a bit of a garbled explanation by the petitioner, was it not? It was, but it's immaterial and the question was put affirmatively. You live in Minnesota. He lives near Minnesota. He lives in Sioux Falls, South Dakota. He testified that the reason why he didn't go to church in Minnesota was because he couldn't get a ride there. I don't know if I would assert that his address is not a material issue in this. The judge found and stated in the record. Part of the discussion about his Christianity and why he didn't go to church there was intertwined with his professed. Right. I would assert that his explanation that he went to church in Arcadia and was able to provide an address and the name of a pastor was more significant. He basically stated he was unable to go to church in Minnesota because there were no churches that would provide a service in the Mandarin language. But why did he say that if he didn't live there? Because the question was put to him, do you live in Minnesota? He said yes. I really can't explain that. I don't know why he said that. He did live 30 miles away in Sioux Falls. I don't think they really understand the difference between communities. Again, I would argue that that's not material. With his fundamental claim, the judge found that it was basically his response to those three questions that she denied his asylum application. But for his response, she would have approved his application. She also noted there was not a single document in support of his application, despite the proceedings lasting or waiting some two years, not a single document to support the position on Christianity. And she also said that all of that in totality went to the heart of the claim. What's wrong with that? Well, Your Honor, I would argue that apparently what the IGA wanted at the time was a letter from the church. He didn't provide it. His testimony, I think, was sufficient. Not just from the church, from anyone. Nothing. Nothing from someone he went to church with. Nothing from, as you say, the pastor. Not a single piece of paper. Right. That, as I read the IGA's decision, was also a significant factor in the decision. Well, it was part and parcel, but I believe fundamentally it was his response to the questions which in actuality were accurate. And his demeanor. Something we cannot judge at this level, but certainly the trial person can. Granted. But I would assert that when it gets to the heart of it, the question as to whether the gentleman can respond with knowledge as to his Christianity is not a question that's put to him by the Chinese authorities upon his arrest or his or her arrest. They're not interested in the extent of their knowledge. They're interested in who they're associating with and whether they're involved in any insubordination against the Communist Party. His understanding of the Christian religion is not part and parcel of his arrest, his detention, which he found to be credible. Six interrogations, four beatings, 19 days, dislocated finger. She found it. But for her belief that he didn't rise to the level of his understanding of the Christian religion as she thought proper, she denied his claim. And I would defer the rest of my time, if no further questions, for some rebuttal. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. My name is Kevin Kijewski for the respondent, the United States Attorney General, Eric Holder. The petitioner lately petitioned the Court for review of the decision of the Board of Immigration Appeals that had adopted, expanded, and affirmed the immigration judge's denial of the petitioner's application for review. The issue is whether any reasonable fact finder would be compelled to reverse the finding that the petitioner was not a credible witness. Counsel, don't you think it's a little problematic that the IJ was trying to judge the level of knowledge the petitioner had about Christianity? I do think it would be problematic if the IJ was trying to judge the level of knowledge that the petitioner had about Christianity to judge whether the petitioner was a Christian. I think that might be getting into something subjective, but I think that the IJ's questions, and based on the record and the testimony and the applications by the petitioner, is really the IJ was trying to find out whether the petitioner was practicing and had been practicing Christianity to support his claims that he was persecuted. Well, she didn't ask him, how often do you go to church? You know, what are your services like? She didn't ask him any of that. She asked him fundamental questions about the Christian faith. And so why were his answers such that his credibility was tainted? Well, I think it was taken in a whole over years. When the IJ had the merits hearing, it was two and a half years after the petitioner said, I will bring in, and specifically at one extension, one of the several extension requests, that I will bring in corroborating evidence of attending church. And that wasn't done, so I think there was a question about that. And so I think that the IG had problems with the witness being evasive. So did the IJ say, you know, two and a half years ago you said you would bring in corroborating evidence. Where is that evidence? Was that specific question put to the petitioner? No, but there was a date set in December, right before the merits hearing, and there was nothing submitted. So I think that the IJ knew that there was nothing there that was submitted. The BIA expanded on that and did say that that was significant, that there was nothing brought in to corroborate the claims. When credibility was called into question, as it was here, and the credibility was called into question, not just because of answering specific questions or trying to draw out something that would support a claim that I've been practicing, if I'm the petitioner, practicing Christianity continuously for the last five years, and trying to go to church, having home-based churches in China, and then leaving China because I can't practice, and then going to a church in California, in Arcadia, I think that was to draw out any kind of questions to support that claim. So, yes, there could have been other questions that were asked, but I think that's the way how it is all the time. There's always other things that can be asked. Yeah, but these particular questions didn't really go to how often he was going to church, where he was going, who could confirm that he actually attended. These questions did not go to that. They went to his beliefs regarding, you know, is Thanksgiving a religious holiday. That has nothing to do with where he was going to church or how often he went or who could confirm it. You know, what's the difference between the New Testament and the Old Testament? That's questioning his beliefs as opposed to how often he went to church and whether or not there was corroboration for it. That's the part that bothers me. Yeah, and I think it might be close to doing that, but I don't believe it actually is questioning his beliefs. She didn't say, are you a Christian, do you believe in Jesus Christ? She said, tell me some things about somebody who has been practicing for the last four to five years continuously, some things that somebody would know about it. I think they were open doors. Maybe so and maybe not. It depends on, you know, what the minister is teaching and what the Bible class people are teaching. So that's hard to gauge in terms of, you know, what people have been taught, because they're only taught what their leaders teach them. And so perhaps he wasn't taught a difference between the Old Testament and the New Testament at that point. That's why it's difficult for me is because she's asking him questions that you don't know, you know, what the right answer is. What's the right answer? Well, and I think the right answer for somebody who has been continuously practicing is, this is what it is in my opinion. This is what I've learned, whatever that might be. And that's what he gave her. This is what I've learned about the difference between the Old Testament and the New Testament. The Old Testament was written in Hebrew. The New Testament was written in Greek. Not a wrong answer. I don't believe that's the wrong answer, but I do think it's the wrong answer when you're trying to establish that you've been practicing Christianity and you've been persecuted because of your practicing Christianity. That's an answer that not many practicing Christians would know. I mean, it's just tough. The petitioner here had to show clear probability of persecution due to religion, and is it your position that it's fair to ask some of the questions that were asked here to determine the credibility of that claim, to determine whether or not that petitioner in fact was a practicing Christian, no matter what those answers might be, along with some other questions such as what church did you attend in California, in Minnesota, how often did you go. So I view this as there was sort of a totality of questions, some of which went to the how-to that my colleague just asked about, and others that went to what do you know. And I agree. And I don't think it's all on the IJ to ask those questions. There has to be some responsibility taken by the petitioner. If the petitioner is coming in and saying, I've been practicing, and there's a question that's obviously been raised during the hearing to say, look, there is a question about whether you've actually been practicing. But we're reviewing the IJ's decision, and we're reviewing what the IJ articulated as the basis for the adverse credibility determination. So the petitioner has a responsibility to present the evidence, but the IJ has a responsibility to articulate why he or she made the adverse credibility determination. And in this case, the IJ relied on those three points, and didn't say, you know, I gave him the opportunity to bring corroborating evidence, he said he was going to, and he didn't. I believe that was on the record, and the IJ knew that, and the BIA when they reviewed and expanded on the IJ's decision, they knew that. There was opportunity, and there was a proactive, you know, request to bring in corroborating evidence, and I do think that that is a fatal flaw here is because if there is a question, if you look at the totality of the demeanor of the witness, the petitioner, the somewhat evasiveness on addresses, evasiveness on where the mother and where the father lived, and a general lack of candor to the tribunal, then I do think that the fatal flaw is not bringing in that corroborating evidence. It's a close case. Are you familiar with the Cosa v. McCasey case of this circuit about two years ago? Vaguely, Your Honor. It gives some authority for the proposition that the IJ's personal views of religion and those testing questions that she used, or he used in this case, are not a proper basis for a credibility finding. And if you have any, how would you distinguish that case from this case? Yes, Your Honor. I am familiar with that case, and I appreciate your reminding me. I don't believe that the specific views of Christianity, of the IJ, were propelled into this merits hearing. I think the questions were general questions trying to pull out some more credibility, some more evidence that the petitioner was actually a practicing Christian. And I don't think the petitioner did that. The case turns on the credibility finding and the substantialness of the evidence to support the credibility finding. And it's pretty close to just a difference of opinion between the IJ on what Christian beliefs include and the information that the petitioner gave in answer to her questions. So is that substantial evidence on which to base the credibility finding? I don't believe so, Your Honor. I think that the IJ went much further than that and talked about demeanor and talked about evasiveness. What was evasive about his question? He didn't understand the English language very well. That was pretty obvious. It's my understanding that there was a certified translator that translated this and so that it would have been in Mandarin. He didn't speak in English. So he was evasive in a number of manners. He was evasive where his mother and father lived, if his father was alive. He was evasive when he specifically talked about Christianity and where he was going. He had said, you know, there's a question about do you live in Minnesota. That question was prompted from the paperwork at that time. Wasn't that Minnesota courthouse the closest one to where he lived and where he was staying in South Dakota? Absolutely, and I don't think it matters. I don't think he knows the difference. You go across the river and you don't speak the language. You don't read the signs. You don't know where you are. You go to the courthouse. Somebody takes you to the courthouse. I don't think it matters whether it was South Dakota or Minnesota. I don't think that's a key question. What the question was about was are you living in South Dakota or Minnesota or are you living in California? And it was tough to get answers consistently on the record. He was hopping around quite a bit. He was in California at the time when he had to go back over there to Minnesota for a hearing. I think when it came out eventually that he was only in South Dakota, whether it's South Dakota or Minnesota, whatever he thinks it is, up in the upper Midwest for 14 days or so. He was living on his own, started working on the 16th of July of 2001, and then on the 30th he was arrested. So it was a short amount of time. Then he went, from what I can piece together, from what the record shows, that he went right back to California and he was there the whole time, even though there were still things coming out that he was submitting saying, I live in South Dakota or Minnesota, whatever. I don't think it matters, but outside of California. And I think that the demeanor really triggered these questions. I don't think that these were typical questions that would come out in a hearing, in a merits hearing, but I think that the demeanor and the candor and the evasiveness about family. He wouldn't admit that he was working. He was only saying he was helping out at the restaurant where he took employment. And I think there was a general lack of candor to the court that prompted this. Do you think that the IJ would have made the same adverse credibility determination in the absence of the questions about this religion? I think that the IJ would have made the same credibility determination, would not have made the same credibility determination, if the petitioner would have come forth with more support for I am a practicing Christian, and that's what I was persecuted for. So the answer to my question is no. Would the IJ have made the same adverse credibility determination in the absence of the questions about religion? I believe so. Yes, Your Honor. So the answer is yes. Okay. All right. Thank you. If there's no further questions. Your Honor, I just wanted to point out that the oral decision is replete with the IJ's referrals to if she doesn't believe that his answers as to the Christian religion were proper and therefore he is not a Christian, not as to whether he's a practicing Christian. Generally in these kinds of cases there's a lot of... Was it a mistake that she left out the word practicing? Well, one is different than the other. One requires an action. One is a belief. A person... He professed to be a practicing Christian. Did he not? Right. Right. But the judge is basing her decision, and it's on page 5657 of the certified administrative record, that based on his response to her question she does not believe that he is a Christian. Quote, The court's finding is premised on the fact that it concludes he has not been a credible witness, and the credibility determination is not only based upon an examination of the spoken word when compared to the written word, but also based upon the respondent's demeanor as a witness. End quote. She only refers to demeanor at one point in her whole decision, and that's when there's a discussion on the address. I don't know how an IJ looks at demeanor. I mean, it's a very subjective... But only on cases where we affirm demeanor evidence. The IJ has specifically pointed out that he fidgeted when he was asked a certain question. He paused when he was asked a certain question. He answered readily to the questions that were favorable and didn't answer readily to the questions that were unfavorable. We have something specific that we can look at in terms of gauging the misdemeanor determination. I don't think there's any reference to any of that in this alumnus' decision. Quote, The respondent in this case at times appeared evasive, particularly on cross-examination to answering specific questions, etc. End quote. Where's the specifics in that? As to what? In the rest of the written opinion. As to what answer? Hard to argue with that. I can't testify here. I was the attorney at record. I can't testify to it. But I, you know, there is such thing as a putative religious belief. I don't think the respondent has to know much at all about the Christian religion to be persecuted for. As a matter of fact, I'm sure of it in communist China. Of course, he could have avoided all these questions by providing some paperwork, could he not? I suppose, but no, I don't think so. A letter from a church, I don't know, that wouldn't have done it. I mean, generally, Your Honors, there's more significant questioning than this by particularly the government attorney. I mean, they go into, it's not just what are Christian holidays and what's the difference between the Old and New Testament. They could be very thorough. They chose not to be thorough here, and they based their adverse credibility determination on these three questions. I personally didn't think it was proper or fair. Well, opposing counsel pointed out that it's really the petitioner's responsibility to prove his or her case. And so the petitioner has some responsibility to establish that he had been attending church and that he had promised to do that. So what's your response to that? Well, he was a bit negligent on that, Your Honor, but he testified orally that he attended church. And he put forth all of his testimony. It was reasonable. And since he testified orally that he went to church, but he had no documentation, wasn't it fair to ask him questions about? Absolutely. And she did. And I firmly believe they could have been more in-depth to set the record properly. They let it stand as it was. And based on their three questions, I think his answers were very forthcoming. And I agree, most Christians, at least where I come from in the Middle East, wouldn't know that the Old Testament was written in Hebrew. They wouldn't know that. They wouldn't think to the next level that the New Testament was written in Greek. So I think it shows that he actually has an understanding that a lot of Christians just generally didn't. All right. Thank you, counsel. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for a decision by the court. The next case on calendar for argument is Sager v. City of Los Angeles.
judges: Zouhary, Goodwin, Rawlinson